IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs July 11, 2017

**STATE OF TENNESSEE v. STEPHAN RICHARDSON**

**Appeal from the Criminal Court for Shelby County**
**No. 13-01971    Glenn Ivy Wright, Judge**

_____

**No. W2016-02227-CCA-R3-CD**

_____

Following a jury trial, the Defendant, Stephan Richardson, was convicted of aggravated robbery, aggravated burglary, employment of a firearm during the commission of a dangerous felony, and unlawful possession of a handgun by a convicted felon.  On appeal, the Defendant contends that (1) the trial court erred by failing to suppress his statement because the "officers unreasonably delayed booking [him] in order to" secure his statement and because his statement was involuntarily given; (2) his conviction for employing a firearm during the commission of a dangerous felony is invalid because the indictment failed to specify the predicate dangerous felony; and (3) the trial court erred by refusing to sever or bifurcate the unlawful possession of a handgun by a convicted felon offense from the other three counts, thereby, preventing him from receiving a fair trial.[1]  Following our review, we affirm the Defendant's convictions for aggravated robbery, aggravated burglary, and unlawful possession of a handgun by a convicted felon.  However, because the jury was charged with a nonexistent crime regarding the employment of a firearm during the commission of a dangerous felony conviction, we reverse that conviction and remand that count for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court**
**Affirmed in Part; Reversed in Part; Case Remanded**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and CAMILLE R. MCMULLEN, JJ., joined.

Brett B. Stein (at trial and on appeal) and Robert Golder (on appeal), Memphis, Tennessee, for the appellant, Stephan Richardson.

_____

[1] For the sake of clarity, we have reordered the issues as presented by the Defendant in his appellate brief.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin E.D. Smith, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Charles Summers III, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

FACTUAL BACKGROUND

This case arises from the November 29, 2012 home invasion of the residence of Candid Sanders ("the victim") and Darrell Peterson located in Memphis. Due to the Defendant's participation in the home evasion, a Shelby County grand jury returned a four-count indictment against the Defendant, charging him with aggravated robbery (count one), aggravated burglary (count two), employing a firearm during the commission of a dangerous felony (count three), and being a convicted felon in possession of a handgun (count four). See Tenn. Code Ann. §§ 39-13-402, -14-403, -17-1307, -17-1324. After a jury trial on May 2 and 3, 2016, the Defendant was found guilty as charged. Thereafter, the trial court sentenced the Defendant to eight years for the aggravated robbery conviction, three years for the aggravated burglary conviction, ten years for the employing a firearm during the commission of a dangerous felony conviction, and three years for being a convicted felon in possession of a handgun. The three-year aggravated burglary sentence and ten-year employing a firearm during the commission of a dangerous felony sentence were to run consecutively to one another, otherwise all sentences were to run concurrently, resulting in an effective thirteen-year sentence.

A. Motion to suppress the Defendant's statement. Prior to trial, the Defendant filed an omnibus motion seeking suppression of his statement that he gave to police following his arrest pursuant to a warrant. In the motion, the Defendant argued as follows:

> It is the [D]efendant's position that it is the policy, practice, and procedure[] of the Memphis Police Department that upon arresting an individual, they put the fictitious charge of "hold for investigation." The intent of this policy, practice[,] and procedure[] is to secure a statement from the [D]efendant before formally booking and processing the [D]efendant. Once the [D]efendant is formally booked and processed, he must be brought before a committing magistrate. Once the [D]efendant is brought before a committing magistrate, the [D]efendant can, then, invoke his Fifth [A]mendment rights. This would foreclose any opportunity of statements being given to the arresting officers. In other words, the purpose and intent of the delay, is to secure incriminating evidence from a [D]efendant before he is formally charged and brought before [the]

-2-

committing magistrate.  The [D]efendant would respectfully submit that such a statement is in violation of due process.

A hearing was held on the motion.  At the outset of the hearing, defense counsel contended,

> [T]he proof will show [the Defendant] will testify that after he was booked and processed when they took him up to the office to talk to him, they had asked [the Defendant] questions . . . before giving him his formal Miranda [r]ights[,] which basically gave them the proper information to ask the questions they did.  So . . . based upon what he told them informally before his Miranda [r]ights, they were in a much better position to go ahead and . . . ask him these formal questions[.]

Thereafter, Memphis Police Department ("MPD") Sergeant Kevin Brown testified that the Defendant was arrested on December 18, 2012, pursuant to a warrant.  According to Sergeant Brown, the Defendant arrived at the Robbery Squad Office after 4:00 p.m. that day, and because the lead investigator, Sergeant Eric Petrowski, was "gone for the day[,]" Sergeant Brown interviewed the Defendant.  Sergeant Minga also participated in the interview.[2]

> Sergeant Brown described the initial phase of his interview process:
>
> We introduce ourselves. . . .  We normally ask do you need anything[.]  We always provide water, restroom.  If you need some food, we find you food. . . .  Then once we introduce ourselves, we may speak briefly just nothing in regards to the case.  And once we get ready to speak in regards to the case, we advise the Miranda [r]ights [and] . . . the Waiver of Rights form is presented.

According to Sergeant Brown, "these [were] the general practices" of the Robbery Squad Office, in addition to also being Sergeant Brown's usual practices.

Sergeant Brown explained that, prior to advising an interviewee of their Miranda rights, he inquired if that person was literate, was under the influence of any drugs, or was sick.  He proceeded to advise the interviewee of their Miranda rights, had them read the rights aloud, and had them sign the Waiver of Rights form indicating whether they wished to speak with him.  Sergeant Brown followed this procedure at the beginning of his interview with the Defendant, and at 5:01 p.m., the Defendant signed the Wavier of Rights form indicating his willingness to speak with Sergeant Brown without an attorney

---

[2] Sergeant Minga's first name is not apparent from the record.

present. The Defendant also initialed each individual right on the form, and the form contains the following provision: "No promises or threats have been made to me and no pressure, force, or coercion of any kind has been used against me." Additionally, Sergeant Brown averred that he did not threaten the Defendant during the interview and that he "tried to be as casual as possible" with the Defendant. Furthermore, Sergeant Brown did not recall the Defendant's being hostile at any point in the interview.

Sergeant Brown was given a copy of the Defendant's statement to review. Sergeant Brown explained that the document was "a formalized written version" of the Defendant's interview. Sergeant Brown detailed how the statement was prepared: first, the Defendant gave an "oral statement"; the Defendant was again advised of his Miranda rights before the statement was reduced to writing; the Defendant initialed that he understood these rights; the statement was typed in a question-and-answer format by Sergeant Brown; and the Defendant reviewed the statement for accuracy before signing the document.

On cross-examination, Sergeant Brown testified that, if an individual is arrested pursuant to a warrant, he or she will usually be interviewed before being "booked and processed in the jail"; moreover, based upon Sergeant Brown's best recollection, that procedure was followed in this case. According to Sergeant Brown, the Defendant was arrested "by uniform patrol officers" and was brought to the Robbery Squad Office under the direction of the lead investigator. Sergeant Brown denied that the Defendant was brought to the Robbery Squad Office first in order to gain "a tactical advantage by [obtaining] a statement" from the Defendant, clarifying that "[s]ometimes [the interview] takes place because we need to find out who suspect Number 2 is."

Sergeant Brown was aware at the time of the interview that the Defendant had been identified in a photographic lineup by the victims and that the victims had given statements. Although it was the lead investigator that prepared the warrant in this case, Sergeant Brown was confident that it was issued with probable cause for the Defendant's arrest. Defense counsel then inquired,

> And then that he had probable cause but notwithstanding that fact, [the Defendant] was not booked and processed into the jail. And you just correct me if I'm wrong because once he's booked and processed in the jail, then he has a right to . . . go to a committing magistrate and have a [p]reliminary [h]earing. I mean have an arraignment. Is that basically correct?

Sergeant Brown replied, "Well, the judicial procedures that the commissioners and the pretrial individuals, I can't get into their policy. But the lead investigator does have the discretion to have an individual brought to the office prior to being booked into the jail."

-4-

Sergeant Brown confirmed that, after the Defendant gave his statement, "he was taken to and turned over to the Shelby County Sheriff."

Defense counsel then asked Sergeant Brown about the MPD's booking and processing procedures, and the State objected on relevancy grounds. Defense counsel responded by citing State v. Bishop, 431 S.W.3d 22 (Tenn. 2014), and County of Riverside v. McLaughlin,[3] 500 U.S. 44 (1991), as standing for the proposition that, when a suspect is arrested and detained, he or she can only be held for booking and processing and not "for the specific reason of securing other evidence" and that any statement obtained during this illegal detention is inadmissible as fruit of the poisonous tree. According to defense counsel, if probable cause supported the arrest, then "the first thing you got to do is take them . . . for booking and processing." The trial court permitted this line of questioning to continue.

Sergeant Brown acknowledged that the Defendant's interview was not video- or audio-recorded. However, according to Sergeant Brown, the "supervisor" listened and watched interviews via a monitor "to make sure that everything [was] okay." In Sergeant Brown's opinion, it was not necessary to take a video.

Sergeant Brown was then asked about specifics during the initial phase of the Defendant's interview. Defense counsel asked, "So . . . when [the Defendant] got in there, . . . who made the first word? Did [the Defendant] say what am I here for? Or did you . . . or one of the other officers say you're here for whatever reason?" Sergeant Brown responded, "I cannot speak on . . . who spoke first. I can state the normal practice is for us to introduce oursel[ves] when we walk into the room." Sergeant Brown stated that he did "the same thing every time" he interviewed a suspect, and he reiterated that it was "not [his] practice to speak about [the] case[,] period[,]" until the individual was advised of his or her rights. Sergeant Brown affirmed that he did not tell the Defendant the type of crime involved or that the Defendant had been identified prior to his issuing Miranda rights to the Defendant.

MPD Sergeant Eric Petrowski testified that he was the lead investigator assigned to this case, that he spoke with the victims in this matter, and that the Defendant had been identified as a perpetrator. Based upon his investigation, Sergeant Petrowski went before a commissioner on December 17, 2012, and secured an arrest warrant for the Defendant. According to Sergeant Petrowski, the Defendant was arrested the next day by the Shelby County Fugitive Bureau. Sergeant Petrowski was asked, "When you issue an arrest warrant are there multiple ways defendants are brought into custody?" He replied,

---

[3] The transcript styles the name of the case as County of Riverdale v. California. However, we cannot find any such styled case. The reference seemingly refers to the case of County of Riverside v. McLaughlin.

Yes. We would put out a flyer within our own department that this person is an actual wanted party. And in turn I think I left a note with Fugitive either on the warrant or by email that if [the Defendant is] located[,] I'd like to be notified so he could be interviewed.

On cross-examination, Sergeant Petrowski testified that the "flyer" was sent out to the entire MPD and that the flyer requested Sergeant Petrowski be notified upon the Defendant's arrest. Additionally, Sergeant Petrowski agreed that "the purpose" of the flyer was to "go ahead and obtain a statement from the [D]efendant to help [the] case." Moreover, Sergeant Petrowski testified that it was no longer the MPD's practice to place "a hold for investigation" status on an arrestee after he or she had been booked and processed.

Sergeant Petrowski was then presented with the arrest warrant for the Defendant. According to Sergeant Petrowski, the warrant provided that the Defendant was arrested on December 18 at 9:09 a.m. Sergeant Petrowski confirmed that, following the Defendant's arrest, he would have been taken to the county jail. Also, it appeared from the arrest warrant that the Defendant was "physically" at the jail about an hour later, shortly after 10:00 a.m. However, Sergeant Petrowski did not recall what time he was notified that day of the Defendant's arrest.

The Defendant testified that he was driving "to a corner store" on the morning of December 18, 2012, when he was arrested by several police officers in "[u]nmarked cars." According to the Defendant, the police officers stopped his car, placed him in the back of a police car, and took him to the county jail. The Defendant believed he arrived at the jail earlier than 10:00 a.m., sometime "[b]etween 7:30 and nine."

According to the Defendant, the officers "dropped [him] off" at "intake" when he arrived at the jail. The Defendant stated that "the first person [he] saw in intake" told him "what [he was] there for[.]" In addition, he was instructed to "have a seat," and they began "[p]rocessing him into the system." He was asked his "name, address, date of birth and all," and his responses were typed into the computer. According to the Defendant, the intake process lasted "[j]ust a few minutes[,]" and he was then placed in a jail cell for "a couple of hours" before being questioned in the Robbery Squad Office by Sergeants Brown and Minga.

The Defendant testified that, while en route to the Robbery Squad Office, the officers spoke with him briefly "but nothing pertaining to the case." Once inside the interrogation room, the officers introduced themselves to the Defendant and "spoke briefly about the case." The Defendant kept asking the officers why he was there, and the officers reluctantly told him that he "was picked out of a photo lineup for a robbery because of a tattoo" on his left arm. According to the Defendant, he was also asked if he

knew the victim, and he responded that he did not.  The Defendant stated that this discussion took place before he was advised of his <u>Miranda</u> rights or signed the Waiver of Rights form.  The Defendant agreed that, once given his <u>Miranda</u> protections, he gave a formal statement.  He further confirmed that he was allowed the opportunity to correct his statement.

On cross-examination, the Defendant acknowledged that he reviewed the Advice of Rights with Sergeant Brown and that he understood those rights prior to giving his written statement.  The Defendant also agreed that he had a chance to review his formal written statement and that he signed the document without making any corrections.

The attorneys then argued the motion.  The prosecutor noted that the Defendant "was arrested under a warrant" and that "[t]here was no hold for investigation."  The prosecutor then averred,

> We have an interview that was given pursuant to that arrest.  The [D]efendant of course had a chance to invoke his rights.  It was voluntary in nature.  Therefore, under any law under the Fourth Amendment, under any law I can conceive of this was an admissible statement given by the [D]efendant.  And, again, . . . I have no opportunity to respond to case law or argument because it is not included in the motion.

Defense counsel replied by citing <u>Bishop</u>, <u>McLaughlin</u>, and <u>State v. Huddleston</u>, 924 S.W.2d 666 (Tenn. 1996), as support for the "pretty well-known" assertion that, "once there's probable cause[,] you can't hold, detain anybody for the specific purpose of securing further evidence[.]"  Defense counsel continued:

> [T]he proof in this record is that he was arrested, given the proof— the inference most favorable to the State, he reached the Shelby County [jail] for booking and processing at 10 in the morning, and the statement was given three hours[4] later.  He testified there was—they booked and processed and the person that booked and processed him was typing in the computer. . . .

Defense counsel then noted Sergeant Petrowski's testimony that a flyer was sent out to the entire MPD to "hold for interview" upon the Defendant's arrest and that the Defendant was so held.  Defense counsel also noted that contradictory testimony was given by the Defendant and Sergeant Brown regarding whether the Defendant was given proper <u>Miranda</u> warnings.  Defense counsel persisted:

---

[4] It is unclear how defense counsel arrived at this calculation.

I think they held him for three hours and lo and behold after he gives the statement, incriminating statement, then they say he's booked and processed. But the proof in the record is by the arrest report he was arrested at 10 o'clock in the morning and booked and processed. So they can't have it both ways.

And I would submit if the proof backs up what [the Defendant] says he was booked and processed on a warrant already showing probable cause, I think from then on you have to—that any hold on him, you know, for the purpose of securing a statement, i.e. hold for an interview is certainly during the—during an illegal detention and is exactly the issue that Huddleston addresses . . . .

By written order, the trial court subsequently denied the Defendant's motion to suppress his statement as transcribed by Sergeant Brown. The trial court first determined that the Defendant voluntarily, knowingly, and intelligently waived his Miranda protections when he signed the Waiver of Rights form. The trial court then addressed the Defendant's argument "that there was a delay in taking [him] to a magistrate pursuant to [the Tennessee Rules of Criminal Procedure] and []Huddleston, . . . and []McLaughlin," and concluded that the Defendant was not entitled to relief. The trial court reasoned that, "[i]n Huddleston, the Tennessee Supreme Court found a delay of [seventy-two] hours violated the requirements of [Tennessee] Rule [of Criminal Procedure] 5[,]" but that the Defendant, to the contrary in this case, "was arrested on a warrant as opposed to a warrantless arrest." The trial court continued, "[T]he [D]efendant was properly booked and processed through the jail procedure immediately and shortly thereafter taken to the Robbery Squad Office."

B. Motions regarding counts three and four. In the same omnibus motion wherein he sought suppression of his statement, the Defendant also requested dismissal of counts three and four. Regarding count three, employing a firearm during the commission of a dangerous felony, the Defendant cited to State v. Richardson, 875 S.W.2d 671 (Tenn. Crim. App. 1993), and contended as follows:

Count [o]ne charges the [D]efendant with the crime of aggravated robbery. The indictment alleges in count one that the robbery was accomplished with the use of a deadly weapon. Your [D]efend[ant] would respectfully submit tha[t] since the [D]efendant has been char[ged] in the first count [with] aggravated robbery by the use of a deadly weapon, to allow the [D]efendant to be charged in count three with an offense by use of a deadly weapon constitutes [D]ouble Jeopardy in violation of the [D]efendant[']s constitutional rights.

-8-

In addition, the Defendant sought dismissal of the convicted felon in possession of a handgun offense, count four, maintaining simply that "to allow a jury to be advised that the [D]efendant has a prior conviction by the use of deadly weapon would be so prejudicial[] that the [D]efendant's due process rights would be violated."

He later filed a second motion seeking dismissal of count four on double jeopardy grounds because "the exact and identical proof would be introduced" to support both counts one (aggravated robbery) and four (unlawful possession of a handgun by a convicted felon):

> Your [D]efendant respectfully submits that count one of the indictment alleges that the [D]efendant put the alleged victim in fear by using a deadly weapon. Count four alleges that the [D]efendant was a convicted felon at the time of the use of the deadly weapon which was alluded to in count one of the indictment.

At the motion to suppress hearing, defense counsel seemingly made reference to these "other issues" and indicated that he would be submitting those issues on "legal argument" alone. But, it does not appear that the issues were brought to the trial court's attention again until after voir dire had been conducted and the venire was waiting for trial to begin.

Initially, the trial court stated that the Defendant's "motion to bifurcate the charge of being a convicted felon in possession of a firearm," count four, was granted. Accordingly, the State was "prohibit[ed] . . . from mentioning that [the Defendant] was a convicted felon during the case-in-chief."

Then, defense counsel referenced the original omnibus motion and the argument set forth therein that double jeopardy principles required dismissal of count three because both counts one (aggravated robbery accomplished with a deadly weapon) and three (employing a firearm during the commission of a dangerous felony) involved the use of a deadly weapon. He then cited his second motion wherein he argued for dismissal of count four on double jeopardy grounds because counts one (aggravated robbery accomplished with a deadly weapon) and four (being a convicted felon in possession of a handgun) were based on "exact and identical proof."

Next, defense counsel restated the due process argument in the original omnibus motion regarding count four—that admission of the Defendant's prior conviction involving a deadly weapon would be "so prejudicial due process rights would be violated." Defense counsel averred, "So that's really the issues except you could call it severance, a bifurcation, whatever kind of analogy you want." Additionally, defense counsel cited as authority State v. Martin Boyce, No. W2012-00887-CCA-R3-CD, 2013

WL 4027244 (Tenn. Crim. App. Aug. 6, 2013), in support of the argument. According to defense counsel, this court concluded in Boyce "that joinder to the possession of a handgun with the other offense was mandatory" and that "the relevant inquiry was whether severance of the possession of a handgun by a convicted felon charge[] was necessary . . . to provide a fair determination of [the Defendant's] guilt or innocence of each offense." Defense counsel acknowledged that the Boyce court ultimately held that severance was not necessary under that standard and that, even if the denial of a severance of the handgun possession offense was in error in that case, such error was harmless. However, extrapolating from Boyce, defense counsel contended that "mandatory joinder in this particular case . . . would so prejudice the jury that [the Defendant] couldn't get a fair and impartial trial" and that the Defendant would be harmed by admission of the prior conviction.

The prosecutor responded by first noting his frustration with defense counsel's failure "to reduce what he was praying from the [c]ourt to writing, what he saw the remedy would be and ultimately the law that allows him to have such remedy." Regardless, the prosecutor noted the Boyce court's conclusion that joinder was appropriate under the facts of that case. Next, the prosecutor returned to the bifurcation arugment, stating that "there [was] no law suggesting that there [was] a need to bifurcate" and "whereby severance or joinder[,] it would be an appropriate thing to completely wholesale cut out the evidence that he was a prior felon." The prosecutor, "in just an abundance of fairness[,]" agreed to stipulate that the Defendant, "at the time of the offense[,] had a felony prior conviction." The prosecutor then noted his displeasure with defense counsel's "chang[ing] the argument" on the day of trial.

The prosecutor recounted the facts of the home invasion for the trial court. According to the prosecutor, "the use of the firearm [was] inextricably . . . involved with all the facts of the case[,]" and severance was, therefore, not appropriate. The prosecutor further maintained, "[T]he fact that [the Defendant] is a convicted prior felon in their home during a robbery using a firearm is the basis for that charge. It's elemental[.]"

The trial court then ruled that mandatory joinder was appropriate based upon the facts as they had been relayed to the court. Regarding bifurcation, the trial court noted that the State had submitted the case of State v. Timothy Damon Carter, No. M2014-01532-CCA-R3-CD, 2016 WL 7799281 (Tenn. Crim. App. Mar. 8, 2016), wherein this court stated that it was "not aware of any law that requires bifurcation of the charge of a convicted felon in possession of a firearm" and that "in fact it [was] an element of the crime." Relying on this language from Carter, the trial court determined that "it [was] appropriate to proceed as the case [was] indicted" and that it would not bifurcate the convicted felon charge.

-10-

Defense counsel then returned to his argument concerning dismissal of count three, relying upon double jeopardy principles espoused in Richardson, 875 S.W.2d 671, because both counts one (aggravated robbery accomplished with a deadly weapon) and three (employing a firearm during the commission of a dangerous felony) involved the use of a deadly weapon. Defense counsel did not elaborate further. Again, the prosecutor noted his frustration with defense counsel's failure to explain "how double jeopardy even applie[d] in this matter" and his "trouble deciphering" defense counsel's argument. The trial court interjected with its ruling. First, the trial court stated that defense counsel's double jeopardy argument, "mean[ing] trying a man for the same crime twice[,]" was without merit because "these [were] different elements that [were] outlined in the indictment by law[.]" Trial resumed the next day.

C. Trial. Although the Defendant does not contest the sufficiency of the evidence on appeal, we will briefly summarize the State's proof presented at trial. Around 10:45 p.m. on November 29, 2012, the victim was at home with her friend Monique Jones, when the Defendant knocked on the door looking for the victim's boyfriend, Mr. Peterson. However, Mr. Peterson was not home because he had gone to visit a friend. The victim told the Defendant that Mr. Peterson was not home, and the Defendant "left out the door" and disappeared. At the time of her conversation with the Defendant, the victim, unbeknownst to the Defendant, was also on the phone with Mr. Peterson. She informed Mr. Peterson that the Defendant was at their house waiting on him.

The victim returned to the kitchen and continued talking with Ms. Jones. However, Ms. Jones's "gaze went completely blank," according to the victim, and Ms. Jones would not respond to questioning. When the victim turned around, "a guy [was] standing there with a shotgun over the refrigerator and said you know what this is." At first the victim thought it was just a game, but the man "came from around the refrigerator and cocked the gun in [her] face and said, B---h, this is not a game. Get on the floor." She got on the kitchen floor as ordered and began pleading with the man not to hurt her and telling him that she had kids. Thereafter, the Defendant entered the kitchen and started hitting the victim with a silver handgun, asking, "[W]here the money at, B---h?" She told the Defendant that she did not have any money, but the Defendant kept insisting that she did. The victim testified that Ms. Jones had vanished from the kitchen.

When Mr. Peterson returned to the residence, he noticed an individual acting as a lookout in front of his house. The lookout yelled inside to the other individuals that Mr. Peterson was coming towards the house and then that individual fled. According to the victim, the remaining men were "rolling" the tire rims out of the house, when they encountered Mr. Peterson. Mr. Peterson said that he came face-to-face with the

Defendant once inside the home, that the four men dropped the rims and ran, and that they got inside a black Nissan Altima parked in the driveway and drove away.

According to Mr. Peterson, the victim told him that she had been hit with a gun, and he saw a "bruise on [the victim's] side." After the men drove away, the victim called the police. Moreover, the victim estimated that the whole incident lasted about five or six minutes. According to the victim, the men ransacked her home, taking $500 in cash and attempting to steal four tire "rims that [went] on [her] car[.]"

While the victim and Mr. Peterson were speaking with the police about the incident, the Defendant telephoned the victim and said, "[Y]ou better keep you a gun because we'll be back to pay you a visit. . . . You let your guard down." The police were able to listen to the conversation over the telephone's speaker. According to the victim, the Defendant had also sent her text messages, which she showed police. MPD Officer Cedric Chalmers testified that the Defendant sent text messages to the victim using phone number 5490 and that he called her using phone number 2448.[5]

In addition to speaking with Mr. Peterson and the victim, the police interviewed Ms. Jones after the robbery. The police also searched Mr. Peterson's and the victim's residence and did not find any contraband or firearms. According to Officer Chalmers, the residence was "a little disheveled[,]" and the scene "was consistent with what the victims" had told him.

The victim testified that she recognized the Defendant because he had come by the house earlier in the day on November 29, 2012, to sell pain pills to Mr. Peterson. Moreover, the victim witnessed the Defendant's selling Mr. Peterson "some pain pills" "a couple of days" prior to the home evasion. Mr. Peterson testified that he had dealt with the Defendant "[a] couple of times" and that he needed the pills because he had "a hole in [his] tooth."

Also, both the victim and Mr. Peterson recognized the black Nissan Altima in the driveway and stated that it belonged to the Defendant. Furthermore, according to Mr. Peterson, the Defendant drove a white Chevy Impala to the house during the Defendant's earlier visit on November 29, 2012.

Sergeant[6] Petrowski testified that the Defendant was developed as a suspect in this case because one of the phone numbers obtained from the victim's phone was "associated

---

[5] For purposes of anonymity and clarity, we will refer to telephone numbers using the last four digits only.

[6] Sergeant Petrowski had achieved the rank of detective by the time of the Defendant's trial.

with" the Defendant's girlfriend, because a black Nissan Altima was registered to the Defendant's girlfriend, because a white Chevy Impala was registered to the Defendant, and because both Mr. Peterson and the victim had selected the Defendant in a photographic lineup. Sergeant Petrowski affirmed that he tried to follow-up with Ms. Jones during his investigation but was unable to locate her.

Sergeant Brown testified that he interviewed the Defendant on December 18, 2012, following the Defendant's arrest, and that Sergeant Minga assisted with the interview. According to Sergeant Brown, the Defendant was advised of his Miranda rights; the Defendant read each right aloud; the Defendant placed his initials by each right; and the Defendant signed the document. Thereafter, Sergeant Brown took a formal statement from the Defendant, starting the conversation casually before talking about the case. Sergeant Brown ultimately typed the Defendant's statement, which the Defendant signed. Moreover, Sergeant Brown testified that the Defendant was again advised of his rights and initialed that he understood those rights before affixing his signature to the written statement. According to Sergeant Brown, the interview was not lengthy in nature, beginning around 5:01 p.m. and concluding at approximately 6:01 p.m.

Sergeant Brown also relayed that it was standard procedure to offer an interviewee food and water and provide restroom facilities. Sergeant Brown further said that his procedure of taking written statements, rather than recording, was the policy of the MPD.

The Defendant did initial some of his responses in the written statement, but he failed to initial others. Sergeant Brown agreed that the Defendant "decided to stop cooperating" at some point. Sergeant Brown explained that an oral statement was given first and then that statement was reduced to writing and that the Defendant was given the opportunity to make any changes to the statement before his signed it. So, the entire interview had been conducted and reduced to writing when the Defendant decided to stop initialing his answers, according to Sergeant Brown.

Both the Waiver of Rights form and the Defendant's statement were entered into evidence. The Defendant's statement reads, in pertinent part, as follows:

> Q: Did you participate in the aggravated robbery/aggravated burglary of Darrell Peterson/ Candid Sanders/ MoNique Jones, which occurred at 3412 Eastport, on 11/29/12 at approximately 10:40pm?
>
> A: No.
>
> Q: Did anyone else participate, if so, name them?
>
> A: Yes, I don't know their names.

-13-

Q: Were you armed with a weapon, if so, describe it?

A: No.

Q: Was anyone else armed, if so, describe the weapon?

A: It [was a] 12[-]Gauge shotgun I think.

Q: What was taken in this robbery?

A: I have no idea.

Q: What did you receive from this robbery?

A: Nothing.

Q: Was a vehicle used during this robbery, if so, describe the vehicle?

A: Black Nissan Altima.

Q: Who does this vehicle belong to?

A: My girlfriend.

Q: How long did you all plan this robbery?

A: About an hour.

Q: What were you all hoping to gain from the robbery?

A: Money.

Q: Are you willing to show us where the other suspects live?

A: I will they around [sic] the corner from my girl, but what am I going to gain from it.

Q: Describe, in detail, the events prior to, during and after this robbery?

A: I don't have nothing [sic] else to say.

. . . .

-14-

Q: I will ask you to read this statement, consisting of [three] pages, and if you find it to be exactly as you have given, I will ask you to initial the bottom of each page and place your signature along with the date and time on the line below: Do you understand?

The Defendant answered this last question by signing the document. In addition to initialing his responses on page one, the Defendant's initials appear at the bottom of page two, and his signature appears on page three.

That concluded the testimony and proof from the State's witnesses. Thereafter, the following stipulation was provided to the jury:

That as of the date of the charged conduct on November 29, 2012, [the Defendant] was a convicted felon as described in T[ennessee] C[ode] A[nnotated] [section] 39-17-1307. Accordingly, the State of Tennessee and [the Defendant] agree that it will not be necessary for the State to present such evidence to the jury.

The Defendant timely appealed the jury's guilty verdict. The case is now before us for our review.

ANALYSIS

On appeal, the Defendant asserts that the trial court erred by denying his motion to suppress his statement given to Sergeants Brown and Minga, his motion to dismiss the charge of employing a firearm during the commission of a dangerous felony because the indictment failed to specify the predicate dangerous felony, and his motion to sever the unlawful possession of a handgun by a convicted felon count from the other three counts. We will address each issue presented.

*I. Motion to Suppress*

On appeal, the Defendant cites to Huddleston and McLaughlin and maintains that his "confession should have been suppressed because it was the result of an involuntary interrogation in which officers unreasonably delayed [his] booking . . . in order to gather evidence against him." He then asserts that a delay of less than forty-eight hours is unreasonable when it is for the purpose of gathering additional evidence to justify the arrest, citing to Bishop and McLaughlin. According to the Defendant, because "[t]he officers already had a determination of probable cause against [him] through the arrest warrant, . . . there was no reason not to immediately proceed to booking and processing other than to create a delay which would induce [him] to give an involuntary statement."

Furthermore, the Defendant submits that the "trial court erred when it failed to exclude [his] statement, which was both involuntary and contained numerous statements which he had not adopted."[7] He cites to the totality of the circumstances factors outlined in Huddleston to determine when a confession is voluntary. In this regard, the Defendant maintains that his confession should have been suppressed because it was not voluntarily given to Sergeant Brown, noting that he "did not answer several of the questions at the end of the statement, including the crucial question of whether his statement was free and uncoerced[,]" and that he "did not adopt[] several of the answers as his own statements by initialing them."

The Defendant persists, "[e]ven if, arguendo, [he] had been free to leave at the time that this statement was collected, it would still fail to be a voluntary statement because it consisted primarily of statements by Sergeant Brown forced upon [him], many of which [he] refused to adopt." Finally, any error in this regard was not harmless, according to the Defendant, because the "involuntary confession was a crucial element of the [S]tate's case." Moreover, the Defendant complains that Sergeant Brown read the statement into evidence as if it were the Defendant's statement.

A trial court's findings of fact on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. State v. Binette, 33 S.W.3d 215, 217 (Tenn. 2000). Questions about the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Both proof presented at the suppression hearing and proof presented at trial may be considered by an appellate court in deciding the propriety of the trial court's ruling on a motion to suppress. State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998); State v. Perry, 13 S.W.3d 724, 737 (Tenn. Crim. App. 1999). However, the prevailing party "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from the evidence." Odom, 928 S.W.2d at 23. Furthermore, an appellate court's review of the trial court's application of law to the facts is conducted under a de novo standard of review. State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001) (citations omitted).

The Defendant appears to contend that any detention prior to booking and processing for the sole purpose of gathering additional incriminating information violates his Fourth Amendment rights as set forth in McLaughlin, 500 U.S. 44, and Huddleston, 924 S.W.2d 666. Accordingly, the Defendant contends that his detention was unlawful, and the trial court erroneously denied the suppression of his statement. After a thorough review of the record, we respectfully disagree.

---

[7] In the Defendant's brief, the voluntariness aspect of his confession is completely comingled with the alleged Fourth Amendment violation.

When a person is arrested without a warrant, the law requires the arresting authorities to take him or her before a magistrate to seek "a prompt judicial determination of probable cause." Gerstein v. Pugh, 420 U.S. 103, 125 (1975); Huddleston, 924 S.W.2d at 672; see also Tenn. R. Crim. P. 5(a)(1)(A) ("Any person arrested—except upon a capias pursuant to an indictment or presentment—shall be taken without unnecessary delay before the nearest appropriate magistrate of . . . the county from which the arrest warrant issued[.]").[8] A judicial determination of probable cause is generally considered "prompt" if it is made within forty-eight hours. McLaughlin, 500 U.S. at 56; see also Bishop, 431 S.W.3d at 36. A delay shorter than forty-eight hours may still be unreasonable and unconstitutional if it is "for the purpose of gathering additional evidence to justify the arrest" or if it is "motivated by ill will against the arrested individual . . . ." McLaughlin, 500 U.S. at 56; see also Bishop, 41 S.W.3d at 36.

Specifically, the Defendant relies on the Tennessee Supreme Court's decision in Huddleston to support his position that his detention prior to booking and processing was unlawful because it was solely for the purpose of gathering additional information against him. The situation faced by the court in Huddleston, however, is clearly distinguishable from the case at hand. The defendant in Huddleston was arrested without a warrant on a Friday afternoon and held without a judicial determination of probable cause before issuing a confession, preceded by Miranda warnings and a signed Waiver of Rights form, on the following Monday afternoon. 924 S.W.2d at 668. The next day, relying solely on the defendant's confession, a police detective obtained a probable cause warrant from a magistrate. Id. Our supreme court concluded that "the exclusionary rule should apply when a police officer fails to bring an arrestee before a magistrate within the [forty-eight hours] allowed by McLaughlin." Id. at 673. Any evidence obtained from an unlawful detention must be suppressed under the fruit of the poisonous tree doctrine. Id. at 674-75. Because the defendant was held more than seventy-two hours without a judicial determination of probable cause and the State failed to justify the delay, the Huddleston court found that the defendant's Fourth Amendment rights were violated. Id. at 675.

When a suspect is arrested on probable cause, however, the ensuing detention is typically not illegal until it "ripens" into a Gerstein violation. Huddleston, 924 S.W.2d at 675. Thus, "if the [arrestee's] statement was given prior to the time the detention ripened into a constitutional violation, it is not the product of the illegality and should not be suppressed." Id. Moreover, "the issuance of a valid arrest warrant satisfies the requirement that there must be a judicial determination of probable cause for extended detention." State v. Carter, 16 S.W.3d 762, 766 (Tenn. 2000) (citing Baker v. McCollan, 443 U.S. 137, 143 (1979)). As the United States Supreme Court reasoned in Baker,

---

[8] The Defendant does not include a separate Rule 5 violation argument in his appellate brief, although Rule 5 was addressed by the trial court.

Since an adversary hearing is not required, and since the probable-cause standard for pretrial detention is the same as that for arrest, a person arrested pursuant to a warrant issued by a magistrate on a showing of probable cause is not constitutionally entitled to a separate judicial determination that there is probable cause to detain him pending trial.

443 U.S. at 143; see also Carter, 16 S.W.3d at 766.

Sergeant Petrowski testified at the suppression hearing that he went before a commissioner on December 17, 2012, and secured an arrest warrant for the Defendant, who had previously been identified as a perpetrator by the victims of the home invasion. At 9:09 a.m. the following day, the Defendant was arrested by the Shelby County Fugitive Bureau. The Defendant did not challenge the probable cause determination. Moreover, according to Sergeant Petrowski at trial, the Defendant had also been developed as a suspect because one of the phone numbers obtained from the victim's phone was "associated with" the Defendant's girlfriend, because a black Nissan Altima was registered to the Defendant's girlfriend, because a white Chevy Impala was registered to the Defendant, and because both Mr. Peterson and the victim had selected the Defendant in a photographic lineup.

Also, Sergeant Petrowski reviewed the arrest warrant and noted that it appeared from the warrant that the Defendant was "physically" at the jail about an hour after his arrest, around 10:00 a.m. Importantly, the Defendant testified at the suppression hearing that he was booked and processed into the jail upon his arrival, and the trial court accredited this testimony in its findings. The Defendant testified that the intake process lasted "[j]ust a few minutes[,]" and he was then placed in a jail cell for "a couple of hours" before being questioned in the Robbery Squad Office by Sergeants Brown and Minga. Morevoer, the interview began at approximately 5:01 p.m., which was only eight hours following the Defendant's arrest.

At the motion hearing, defense counsel[9] relied upon the Defendant's testimony in this regard, stating,

But the proof in the record is by the arrest report he was arrested at 10 o'clock in the morning and booked and processed. . . . I think from then on you have to—that any hold on him, you know, for the purpose of securing a statement, i.e. hold for an interview is certainly during the—during an illegal detention and is exactly the issue that Huddleston addresses[.]

_____

[9] While it appears that the Defendant's lawyers, Mr. Stein and Mr. Golder, are part of the same firm, it seems that Mr. Stein was the Defendant's trial attorney and that Mr. Golder prepared the Defendant's appellate brief unassisted by Mr. Stein.

(Emphasis added). The Defendant's timing argument has now changed on appeal: "[His] confession should have been suppressed because it was the result of an involuntary interrogation in which officers <u>unreasonably delayed [his] booking</u> . . . in order to gather evidence against him." (Emphasis added). The Defendant cannot have it both ways, either he was booked and processed upon his arrival or he was not. It is well-settled law that a defendant cannot raise an issue for the first time on appeal nor can he change his arguments on appeal. See <u>Lawrence v. Stanford</u>, 655 S.W.2d 927, 929 (Tenn. 1983); <u>State v. Dobbins</u>, 754 S.W.2d 637, 641 (Tenn. 1988); <u>State v. Alder</u>, 71 S.W.3d 299, 303 (Tenn. Crim. App. 2001). Waiver of this issue is appropriate under these circumstances. Moreover, the Defendant has not provided this court with any authority for a requirement that booking and processing must occur before any questioning.

Regardless, following the Defendant's arrest pursuant to a warrant issued upon probable cause, the police were justified in questioning the Defendant about his involvement in the home invasion. The interview took place a mere eight hours after the Defendant was arrested. Sergeant Brown testified that it was standard procedure to offer an interviewee food and water during an interview and provide restroom facilities. The Defendant could have terminated the questioning at any time. The Defendant acknowledged that he understood and waived his right against self-incrimination. The Defendant's interview was not exceptionally lengthy, lasting only an hour. Nothing about the Defendant's arrest and detention gave the appearance of being an "expedition for evidence in the hope that something might turn up" or as "having been calculated to cause surprise, fright, and confusion." See <u>Brown v. Illinois</u>, 422 U.S. 590 (1975).

We note that officers frequently interview defendants to further solidify the State's case. The facts of the case at hand simply do not preponderate against the trial court's finding that the Defendant was not illegally detained. See, e.g., <u>State v. Jeffrey D. Allen</u>, No. W2008-01348-CCA-R3-CD, 2009 WL 2502000, at *8 (Tenn. Crim. App. Aug. 17, 2009) (holding that no Fourth Amendment violation occurred when the defendant was lawfully arrested and detained pursuant to a probation violation warrant), <u>distinguished on other grounds by</u> <u>State v. Rayfield</u>, 507 S.W.3d 682, 704-05 (Tenn. Crim. App. 2015). Thus, the trial court did not err in denying suppression of the Defendant's statement.

Also, the Defendant ostensibly raises as a separate issue that his statement was not voluntarily made because "it consisted primarily of statements by Sergeant Brown forced upon [him], many of which [he] refused to adopt." Because this issue was not broached at the suppression hearing or at trial and is being presented for the first time on appeal, it is waived. Moreover, the Defendant's complaint that Sergeant Brown was allowed to read the Defendant's statement into evidence, in addition to being inadequately briefed by failing to cite to the case law or the record, was not included as an issue his motion for new trial and is likewise waived. See Tenn. R. App. P. 3(e) & 27(a)(7); Tenn. Ct. Crim.

-19-

App. R. 10(b). Although this court may, in certain circumstances, address as plain error an issue that would otherwise be waived, we conclude that the application of the plain error doctrine is not appropriate in the instant case. See Tenn. R. App. P. 36(b); State v. Adkisson, 899 S.W.2d 626, 638-39 (Tenn. Crim. App. 1994). We conclude that these issues are procedurally defaulted.

*II. Employment of a Firearm during the Commission of a Dangerous Felony*
*(Count Three)*

On appeal, the Defendant phrases his argument as whether his conviction for employing a firearm during the commission of a dangerous felony is invalid "because the indictment failed to specify the predicate felony." However, he notes that numerous panels of this court "have been reluctant to grant relief when the defendant merely alleges that the indictment failed to provide adequate notice of the charges against the accused." Instead, according to the Defendant, "panels of this [c]ourt have [been] seriously concerned with violations of the right against double jeopardy and the right to due process in cases where a defendant was convicted of a firearm offense where one of the potential predicate offenses involved use of firearm."

His constitutional argument is two-fold. First, citing to State v. Michael L. Powell and Randall S. Horne, No. E2011-00155-CCA-R3-CD, 2012 WL 1655279 (Tenn. Crim. App. May 10, 2012), he asserts that a defendant's double jeopardy rights are "violated when there is no element of the firearm charge not included in the predicate felony." We interpret the Defendant's argument to suggest that the "predicate dangerous felony" cannot include as an element of that offense the possession or employment of a firearm. See Powell, 2012 WL 1655279, at *14 (holding that the only predicate dangerous felony upon which the firearms charges could have been based was the aggravated burglary offense because that charge did not include the possession or employment of a firearm as an element). Second, citing to Boyce, 2013 WL 4027244, and several other cases, the Defendant submits that "there cannot be a conviction of Tenn[essee] Code Ann[otated] [section] 39-17-1324 where there is a possibility that the jury selected a predicate felony which was not enumerated by the state, thus resulting in a conviction for a 'non-existent crime.'" This second set of cases relies on due process principles. See also Powell, 2012 WL 1655279, at *15 ("[D]ue process does not countenance the conviction of a nonexistent crime.") (citing Adams v. Murphy, 653 F.2d 224, 225 (5th Cir. 1981)).

After setting forth his constitutional argument and seemingly acknowledging that his notice argument lacks merit, the Defendant then makes the following statement: "Under either of these theories, failure to specify the predicate felony is reversible error when only one of the convicted offenses would be a valid predicate felony." However, in support of this proposition, he cites to cases where the State was not required to elect the

-20-

predicate felony. Next, the Defendant notes that "[t]he indictment failed to specify whether he was accused of employing a firearm during the commission of an aggravated robbery or an aggravated burglary" but acknowledges that only the aggravated burglary could have served as the predicate felony. See Tenn. Code Ann. § 39-17-1324(i)(1) (enumerating aggravated burglary as a dangerous felony but not aggravated robbery). The Defendant seems to then present an alternative argument, stating that, even if he was given proper notice by the indictment, (1) the jury may have chosen to convict him of a non-existent crime, i.e., employing a firearm in the commission of an aggravated robbery; (2) "there may not have been a unanimous verdict as to whether the aggravated robbery or aggravated burglary served as the predicate felony"; and (3) "the findings of fact necessary to convict [the Defendant] of employing a firearm during the robbery are not identical to the findings of fact necessary to convict [the Defendant] of employing a firearm during the burglary." The Defendant concludes this portion of his argument, by maintaining,

> A jury without the proper instruction from the indictment would have been more likely to convict [the Defendant] of employing a firearm during the robbery than during the burglary because the role of the gun was far more pronounced when it was used to hit [the victim] during the robbery than it was when [the Defendant] carried the gun while entering the house.

At the outset, we note that much of the confusion is exacerbated by the fact that the Defendant once again changes theories on appeal. At trial, defense counsel only argued for dismissal because both counts one (aggravated robbery accomplished with a deadly weapon) and three (employing a firearm during the commission of a dangerous felony) involved the use of a deadly weapon and, therefore, violated double jeopardy principles espoused Richardson, 875 S.W.2d 671. Defense counsel did not elaborate further. Moreover, the Richardson court held that double jeopardy principles precluded separate convictions for possessing a handgun because the defendant's possession in that case constituted "one uninterrupted course of conduct." 875 S.W.2d at 677 (citation omitted). Richardson did not discuss any of the legal tenants set forth by the Defendant on appeal. Furthermore, the Defendant never made a due process argument pertaining to count three. Accordingly, once again the Defendant has waived plenary review of his issues.

However, despite not being raised as an issue by either of the parties, we find plain error in the jury charge. Both parties base their respective arguments on the mistaken premise that no predicate felony was included in the jury instructions; however, our close review of the jury instructions reveals that the trial court specifically instructed the jury that the predicate dangerous felony for the employment offense was aggravated robbery. As noted above, aggravated robbery is not an enumerated dangerous felony pursuant to

-21-

Tennessee Code Annotated section 39-17-1324(i)(1). A number of cases from this court have found plain error in situations where either the jury was not provided a definition of "dangerous felony" at all—leading to the possibility that they considered a felony that is not defined as dangerous under the firearm statute—or the instructions narrowed the potential predicate felonies but erroneously included a felony that was disqualified because it contained the use of a firearm as an essential element. See, e.g., State v. Curtis Keller, No. W2012-00825-CCA-R3-CD, 2013 WL 3329032, at *5 (Tenn. Crim. App. June 27, 2013); Boyce, 2013 WL 4027244, at *13; State v. Trutonio Yancey and Bernard McThune, No. W2011-01543-CCA-R3-CD, 2012 WL 4057369, at *8 (Tenn. Crim. App. Sept. 17, 2012); Powell, 2012 WL 1655279, at *15. The remedy for such an error was to reverse the firearm conviction and remand for a new trial on that offense. See also State v. Duncan, 505 S.W.3d 480, 491 (Tenn. 2016). Because aggravated robbery was not statutorily permissible as a predicate dangerous felony, the same rationale must hold true in this case. Therefore, the conviction for employing a firearm during the commission of an aggravated robbery is reversed, and that count is remanded for a new trial on the offense of employing a firearm during the commission of an aggravated burglary.[10]

### III. Unlawful Possession of a Handgun by a Convicted Felon (Count Four)

The Defendant contends that "the trial court erred when it failed to sever . . . count four from the . . . remaining counts in the indictment." He then cites to the law for mandatory joinder of offenses but notes that a trial court "shall grant a severance of offenses" when necessary "to promote a fair determination of the defendant's guilt or innocence of each offense." Tenn. R. Crim. P. 8(a), 14(b). The Defendant claims that "the trial court's failure to bifurcate prevented [him] from receiving a fair determination of his guilt or innocence."[11]

As pertinent to our review, Tennessee Code Annotated section 39-17-1307(b)(1)(A) provides that a person commits an offense "who unlawfully possesses a firearm" and "[h]as been convicted of a felony involving the use or attempted use of force, violence, or a deadly weapon." There was no dispute that the Defendant had a qualifying prior felony conviction for aggravated assault.

The Defendant makes no real argument that the counts of the indictment were improperly joined, arguing, instead, that the trial court erred in denying his motion to bifurcate the convicted felon in possession of a handgun offense.[12] The Defendant claims

---

[10] We note our agreement with the State that the indictment in this case adequately apprised the Defendant of the nature and cause of the accusation against him. See Duncan, 505 S.W.3d at 483-491.

[11] The Defendant has abandoned any double jeopardy argument pertaining to this count on appeal.

[12] We feel constrained to note that the terms "bifurcation" and "severance" are not interchangeable.

that "the trial court's failure to bifurcate prevented [him] from receiving a fair determination of his guilt or innocence." According to the Defendant, the law is unsettled in this area and the recent trend has been to require bifurcation of the convicted felon in possession of a handgun charge.

In the trial court, the Defendant relied upon <u>Boyce</u> as supporting his argument for bifurcation, arguing that <u>Boyce</u> established that "the relevant inquiry was whether severance of the possession of a handgun by a convicted felon charge[] was necessary . . . to provide a fair determination of [the Defendant's] guilt or innocence of each offense.". However, on appeal, the Defendant notes, "The State will likely argue that this [c]ourt should follow []<u>Boyce</u>, in which the Western Division found that bifurcation was not necessary." The Defendant then cites <u>State v. Carlos Smith</u>, No. W2012-01931-CCA-R3-CD, 2013 WL 12182606, at *4 (Tenn. Crim. App. Aug. 29, 2013), for the proposition that a defendant has "the option of requesting bifurcated proceedings" and that bifurcation "has been used in the trial courts of this state and has not been criticized by our appellate courts." No. W2012-01931-CCA-R3-CD, 2013 WL 12182606, at *4 (Tenn. Crim. App. Aug. 29, 2013). Next, the Defendant refers to <u>State v. Foust</u>, 482 S.W.3d 20, 46-47 (Tenn. Crim. App. 2015) (citations omitted), wherein this court stated as follows:

> [W]e note that the better procedure where, as here, the defendant is charged with offenses involving the use of violence and force and also charged with the status offense of unlawful possession of a firearm for having a similar prior felony conviction would be to bifurcate the proceedings . . . .

Finally, the Defendant attempts to distinguish <u>Carter</u>, 2016 WL 7799281, the case relied upon by the trial court in its decision not to bifurcate the proceedings, explaining that <u>Carter</u> failed to mention the "numerous cases in which bifurcation has been approved or recommended[.]"

---

Bifurcation concerns splitting a charge into two separate determinations involving guilt and punishment by the same jury, whereas severance deals with separating a charge from other charges in the indictment and trying them individually. <u>See, e.g.</u>, <u>Carlos Smith v. State</u>, No. W2016-01087-CCA-R3-PC, 2017 WL 2730398, at *7 (Tenn. Crim. App. June 26, 2017) ("[I]t is likely that trial counsel was intending to seek bifurcation of the felon in possession charge prior to trial but he erroneously moved for severance of the charges."); <u>State v. Zacheriah Holden</u>, No. M2010-00811-CCA-R3-CD, 2013 WL 871326, at *20 (Tenn. Crim. App. Mar. 8, 2013) ("Therefore, there is no basis upon which to grant a severance of DUI, fourth offense from the charges of aggravated vehicular homicide. To the contrary, the initial proof needed for the DUI, fourth offense charge is also required for the initial proceedings under the statutory required bifurcated proceeding to prove vehicular homicide."); <u>see also</u> BLACK'S LAW DICTIONARY 163, 1374 (6th 1990).

The State responds to the Defendant's claim by first remarking that "case law has . . . consistently held that bifurcation in this situation is not required." Next, the State notes that the Defendant "was permitted to enter the general stipulation that he was a convicted felon" and, therefore, "[h]is right to a fair trial was not violated[.]" We agree with the State.

While <u>Foust</u> recommended bifurcation, none of the opinions of this court have required bifurcation. Ultimately, in <u>Foust</u>, this court affirmed a stipulation between the defendant and the State that the defendant had "a previous felony conviction involving force" and "a previous felony conviction involving violence." 482 S.W.3d at 46. Moreover, our supreme court has held that, with respect to status offenses, like the unlawful possession of a handgun offense at issue here, "specific reference[s] to [a] defendant's prior felonies" are "relevant to establish an essential element of the crime for which the defendant is being tried." <u>State v. James</u>, 81 S.W.3d 751, 760-61 (Tenn. 2002)); <u>see also</u> <u>Foust</u>, 482 S.W.3d at 47. Here, after the trial court denied the Defendant's bifurcation request, the Defendant agreed to stipulate that he "was a convicted felon as described in Tenn[essee] C[ode] A[nnotated] [section] 39-17-1307." The Defendant's conviction for being a convicted felon in possession of a handgun is affirmed. Despite our conclusion, we feel constrained to note our agreement that bifurcation is indeed the better procedure.

## CONCLUSION

We hold that the trial court committed plain error by instructing the jury that aggravated robbery could serve as the predicate dangerous felony. Therefore, we must reverse the Defendant's employing a firearm during the commission of a dangerous felony conviction and remand that charge for a new trial. The Defendant's convictions for aggravated robbery, aggravated burglary, and unlawful possession of a handgun by a convicted felon are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE

-24-